Filed 7/6/23  P. v. Casarrubias CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060529 |
| v. | (Super. Ct. No. 17CF1471) |
| JESUS EDUARDO CASARRUBIAS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jesus Eduardo Casarrubias was charged with attempting to murder 15-year-old Brandon Z. during a drive-by shooting in Santa Ana. At trial, the prosecution presented a considerable amount of gang evidence to establish appellant's motive and intent behind the shooting. This evidence was also used to prove three gang charges that were brought against appellant. Ultimately, the jury convicted appellant as charged, and he was sentenced to 55 years to life in prison.

Since then, the Legislature has enacted a variety of new laws governing gang prosecutions and criminal sentencing. While we can find no basis upon which to disparage the performance of the court or counsel below, we agree with the parties that appellant's gang convictions and his sentence must be reversed due to these new legislative mandates. However, we reject appellant's claim that those mandates and the nature of the gang evidence compel reversal of the entire judgment. Although appellant's gang-based convictions cannot stand and he is entitled to a new sentencing hearing, we otherwise affirm the judgment.

FACTS

On June 11, 2017, Brandon and two of his friends were walking in a Santa Ana alley claimed by the Lopers gang. A Lopers member himself, Brandon felt relaxed traversing the alley at first but when a white sedan suddenly came into view, he lost his nerve and ran. Looking back over his shoulder, he realized he was being fired at from the sedan. He was hit in the wrist and ankle. After the police were summoned, he was taken to the hospital and treated for his wounds.

Brandon told investigators he saw only two people in the sedan, but when responding officers spotted the vehicle leaving the scene, there were three people inside: Christopher Villareal was driving, appellant was in the front passenger seat, and Rafael Marin was in the back. Officers tried to pull them over, but Villareal refused to yield and led police on a high-speed chase through the streets of Santa Ana.

At one point during the chase, Villareal stopped to let appellant and Marin out near an apartment complex where Marin's girlfriend Daisy Aveldanez lived. As appellant and Marin exited the sedan and ran toward the complex, appellant appeared to be holding a dark object in his hand. He and Marin made their way into Aveldanez's apartment while Villareal hit the gas and led police on another short pursuit before finally pulling over and surrendering to authorities. When the police searched his car, they found a spent bullet casing on the front seat.

Meanwhile, the police surrounded Aveldanez's apartment and captured appellant and Marin, who had changed their clothing upon entering the apartment. Officers also took Aveldanez into custody and discovered she had the gun that was used to shoot Brandon tucked inside her underwear. Ammunition for the weapon was found during a subsequent search of her apartment.

Appellant, Marin and Villareal were jointly charged with a variety of crimes. In counts 1 thru 3, the information alleged they committed attempted premeditated murder, assault with a semiautomatic firearm, and street terrorism. In count 4, Villareal was separately charged with recklessly evading the police. (Pen. Code, §§ 664/187, subd. (a); 245, subd. (b); 186.22, subd. (a); Veh. Code, § 2800.2.)[1] The information further alleged as sentence enhancements that defendants committed the crimes in counts 1 and 2 for the benefit of a criminal street gang (§ 186.22, subd. (b)), and in committing the attempted murder, they vicariously discharged a firearm causing great bodily injury to Brandon. (§ 12022.53, subds. (d) & (e)(1)).[2] Appellant was also charged with having suffered a prior serious felony conviction for purposes of section 667, subdivision (a)(1) and the Three Strikes law.

---

[1]  Unless noted otherwise, all further statutory references are to the Penal Code.

[2]  The prosecution initially charged appellant with personally using a firearm causing great bodily injury, but it dismissed that allegation before trial and replaced it with the vicarious discharge allegation.

3

At the defendants' trial, the prosecution presented testimony from gang expert Salvador Lopez, a 15-year veteran of the Santa Ana Police Department who was personally involved in apprehending Villareal following the shooting. He testified Villareal, appellant and Aveldanez were members of the Locotes gang when the shooting occurred, and Marin was a member of the Bishop Street gang. He said the Locotes and Bishop Street were on neutral terms with each other and shared a common enemy in the Lopers, the gang to which Brandon belonged.

In forming his opinion about appellant's gang membership, Lopez relied on several sources, including appellant's Locotes tattoos, his prior contacts with the police during which he admitted being a Locotes member, and court documents showing he had previously committed a crime on the Locotes' behalf. Lopez also considered two YouTube videos of the Locotes gang that were admitted into evidence and played to the jury during the trial.

Lopez described the Locotes as a traditional Hispanic street gang. He said the primary currency of such gangs is respect, and gang members earn respect – for both themselves and their gang – by committing violent crimes. Violent criminal acts by gang members not only spread fear in the community, Lopez said, they also send a message to rival gangs that they are not to be taken lightly.

Lopez said traditional Hispanic street gangs also have a strong allegiance to the Mexican Mafia, which sets rules for how gang members are supposed to act. For instance, gang members are expected to "put in work" for their gangs by committing crimes on the gang's behalf and to back each other up when needed.

Besides describing the general characteristics of traditional Hispanic street gangs, Lopez testified in detail about the Locotes gang in terms of its history, clothing, hand signs, logos, tattoos, territory, graffiti, monikers and criminal activities. He said the gang's primary activities at the time of the shooting in this case were unlawfully possessing firearms and armed assault. The gang was also known for committing

4

attempted murder with semiautomatic firearms. Lopez testified to three instances in which Locotes members (other than defendants) were convicted of committing these crimes. That testimony was used to prove the Locotes had engaged in a pattern of criminal activity, so as to constitute a criminal street gang for purposes of the gang charges.

In response to a hypothetical question, Lopez said that if two Locotes members and a Bishop Street member carried out a drive-by shooting in Lopers' territory in a manner similar to what the defendants did in this case, they would be acting in association with each other and benefiting the Locotes gang by striking fear in their rivals and enhancing their gang's reputation for violence. And, they would be promoting, furthering and assisting criminal conduct by Locotes members.

Appellant did not present any evidence in his defense, and in closing argument, his attorney did not dispute the prosecution's contention that he was the person who shot Brandon. Instead, counsel argued there was insufficient evidence to prove appellant possessed the intent to kill or acted with premeditation and deliberation. The jury disagreed and convicted appellant as charged. This appeal followed.

## DISCUSSION

### *New Definition of a Criminal Street Gang*

While appellant's appeal was pending, the Legislature enacted Assembly Bill No. 333 ((2021–2022 Reg. Sess.) (AB 333)), which increased the prosecution's threshold for proving gang crimes and gang enhancements by narrowing the definition of a criminal street gang and modifying other elements of the gang statutes. Appellant contends these changes necessitate reversal of his gang-based crimes and enhancements, and respondent agrees. So do we.

Appellant faced three separate gang charges in this case, the street terrorism charge in count 3, and two gang enhancement allegations. To prove the street terrorism charge, the prosecution had to establish that when he shot Brandon, appellant was an

5

active participant in a criminal street gang. (§ 186.22, subd. (a).) To prove the two gang enhancement allegations, the prosecution had to establish appellant was acting for the benefit of a criminal street gang. (§§ 186.22, subd. (b); 12022.53, subds. (d) & (e)(1).)

As our Supreme Court recently explained, AB 333 "narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).) The bill also made it harder to prove the pattern of criminal activity requirement included in that definition by limiting the types of offenses that may be used to establish that requirement. (*Ibid*.) Because those changes restricted the scope of the gang statutes, they retroactively govern any criminal case that is not yet final for purposes of direct appellate review. (*Id*. at pp. 1206-1207, applying the rule of retroactivity established in *In re Estrada* (1965) 63 Cal.2d 740.) And because this case falls into that category, respondent admits appellant is entitled to the benefit of those changes.

Respondent also admits appellant's convictions on the gang charges must be reversed because the jury was never instructed on the more restrictive requirements set forth in AB 333, and it is impossible to conclude beyond a reasonable doubt it would have found the gang charges true if it had been so instructed. (See *Tran, supra*, 13 Cal.5th at p. 1207 ["When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, . . . reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error."].) Therefore, we reverse the jury's guilty verdict and true findings on the gang charges and remand the matter to give the prosecution the opportunity to retry those charges under current law. (*People v. Salgado* (2022) 82 Cal.App.5th 376, 380-381; *People v. Sek* (2022) 74 Cal.App.5th 657; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1090-1091.)

*New Procedural Requirement in Gang Cases*

As reflected in newly enacted section 1109, AB 333 also requires trial courts to bifurcate gang charges from nongang charges when requested by the defense.[3] Appellant argues this new requirement mandates reversal of his convictions for attempted premeditated murder and assault with a semiautomatic firearm, but we are not persuaded.

Unlike the substantive changes AB 333 made to the gang statutes discussed in the previous section, the change wrought by section 1109 is purely procedural in that it merely effects the order in which gang charges are tried. Because section 1109 does not narrow the scope of the gang statutes or reduce the punishment for gang activity, some courts have ruled it does not apply retroactively to crimes, such as appellant's offenses, that occurred before its enactment. (See *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Oct. 12, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207.) However, in that section 1109 establishes a procedural safeguard that provides the possibility of a more favorable trial outcome for a particular group of defendants, other courts have found it applies to all cases that are not yet final. (See *People v. Montano* (2022) 80 Cal.App.5th 82, 108, *People v. Burgos* (2022) 77 Cal.App.5th 550, 568, review granted July 13, 2022, S274743; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1130.)

We need not weigh in on this issue because even if the gang charges had been bifurcated in this case, it is not reasonably likely appellant would have obtained a more favorable verdict on the attempted murder or assault charges. (See *Tran, supra*, 13 Cal.5th at pp. 1207-1210 [any error in failing to bifurcate the gang charges at the

---

[3] Section 1109 states that if requested by the defense in a case in which a gang enhancement is charged under section 186.22, subdivision (b), the "question of the defendant's guilt of the underlying offense shall be first determined[,]" and "[i]f the defendant is found guilty of the underlying offense . . . there shall be further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a).) And if the defendant is charged with street terrorism under section 186.22, subdivision (a), "this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (*Id*., subd. (b).)

defendant's trial was harmless under the reasonable-likelihood standard formulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)].) Appellant contends the more rigorous beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) should apply in assessing the ramifications of the failure to bifurcate the gang charges, given the vast amount of gang evidence that was presented against him at trial. However, for the reasons explained below, we do not believe that evidence undermined appellant's constitutional rights. Therefore, the *Watson* standard, not the *Chapman* standard, applies. (*Tran, supra*, 13 Cal.5th at p. 1209.)

Our analysis is informed by several factors, including how the prosecution presented its case against appellant and the strength of the evidence it presented. While the prosecution did not try appellant for personally using a firearm (see *ante*, p. 3, fn. 2), it theorized he was the person who shot Brandon. This theory had substantial evidentiary support, and during closing argument, appellant's attorney made no attempt to refute it. Rather, proceeding on the assumption appellant was the shooter, counsel merely argued appellant did not have the requisite intent to be guilty of attempted premeditated murder. Thus, the primary issue the jury had to decide was the intent with which appellant fired the gun at Brandon.

This is where the gang evidence was highly relevant, if not imperative. Without the gang evidence, there was no apparent motive for why appellant and his cohorts would have wanted to shoot at Brandon. After all, Brandon was simply walking in an alley with friends when appellant's car appeared out of nowhere and bullets started flying. In order to shed light on why appellant fired at Brandon, and more particularly, whether appellant acted with the requisite intent to be guilty of the charged offenses, it was necessary for the jury to understand the underlying gang dynamic surrounding the shooting.

This dynamic was established by the evidence that Brandon and appellant were in rival gangs and that gang members gain respect for themselves and their gang by

8

committing violent offenses such as attempted murder, which just happens to be one of the crimes appellant's gang is known for. This evidence cast light on the motive and intent behind the shooting, as did the evidence bearing on appellant's commitment to the gang lifestyle. That is why the YouTube videos and the evidence of appellant's tattoos, police contacts and criminal activity were admitted into evidence, along with Lopez's expert testimony and opinions.

To be sure, this evidence carried the potential for prejudice because jurors tend to associate gangs with crime and violence. However, the underlying factual circumstances surrounding Brandon's shooting were themselves extremely violent. And while section 1109 prescribes the order of evidence in gang cases, it does not preclude the introduction of gang evidence in a bifurcated trial when such evidence is relevant to the nongang charges. (*People v. Ramos, supra*, 77 Cal.App.5th at p. 1132.) Indeed, our Supreme Court has recognized gang evidence is often relevant and admissible to prove the defendant's motive and the specific intent required for the charged offenses, even though such evidence may have inflammatory aspects. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Given the tremendous probative value of the gang evidence on those issues in this case, as well as the strength of the independent evidence implicating him as the shooter, it is not reasonably likely appellant would have obtained a more favorable result had the gang charges been bifurcated from the other charges. The lack of bifurcation is therefore not cause for reversal. (*People v. Ramirez, supra,* 79 Cal.App.5th at pp. 70-71 (conc. opn. of Wilson, J.); *People v. Ramos, supra*, 77 Cal.App.5th at pp. 1131-1133; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.)

*YouTube Videos*

Appellant mounts a separate attack on the YouTube videos that were admitted into evidence at his trial. He asserts the videos should have been excluded

9

because they lacked proper authentication, were unduly prejudicial and violated his right to a fair trial. Again, we disagree.

Before trial, the prosecutor moved to introduce the videos to prove Villareal was a Locotes member at the time of the shooting. In response to the court's concerns about authentication and possible prejudice, the prosecutor represented that the videos, which are set to rap music, consisted of a series of still photographs that gang expert Lopez was prepared to identify and explain at trial. He said one of the videos was two to three minutes long, and the other ran about five minutes. After entertaining argument from defense counsel, the trial court ruled the videos would be admissible subject to any future objection by the defense. However, no further objections ensued. At trial, the prosecutor played the YouTube videos during Lopez's testimony without any renewed objections.

Lopez testified it is common for gang members to promote their gang through social media. He said he discovered the subject videos on YouTube while he was investigating Brandon's shooting. One of them was labeled "Locotes Gang," and the other was labeled "Locotes X3." As the videos were being played for the jury, Lopez identified Villareal, appellant and several other Locotes members among the photos included in the videos. He said appellant was making Locotes hand signs and wearing the same shoes he had on at the time of his arrest. Lopez also identified graffiti and clothing that he associated with the Locotes gang, as well as various locations in Locotes' claimed territory.

As appellant correctly notes, photographs of guns, money and marijuana are also included in the videos. In addition, one of the photos shows the letters LCTS – an abbreviation for the Locotes gang – spelled out with bullets. There are also a few photos of people inside a jail cell. By and large, though, the videos simply show Locotes members drinking and socializing. Although they have embraced gangster imagery and are promoting their gang affiliation, they are not engaged in any violent activity.

10

As a preliminary matter, respondent contends appellant forfeited his right to challenge the videos on the grounds of lack of authentication and undue prejudice because his attorney did not personally object on those grounds in the trial court. But appellant's attorney did join the objections that the other defense attorneys registered, which encompassed the topics of authentication and prejudice. And to the extent his attorney was ineffective for failing to preserve those issues for appeal, appellant contends he was denied his constitutionally protected right to effective assistance of counsel. Therefore, we will address his claims on the merits. (See *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [taking up forfeited issue "to forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel"].)

To satisfy the authentication requirement for a photograph or a video recording, the proponent of the evidence must prove it is a fair and accurate representation of the scene depicted. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.) Some courts have interpreted that to mean the proponent must produce testimony from someone who can personally attest to the genuineness of the subject photo or video, to ensure it is not a fake or has not been altered in some way. (See, e.g., *People v. Beckley* (2010) 185 Cal.App.4th 509, 515-516.) However, our Supreme Court has made it clear that authentication need not be established by the person who took the subject photo or video or by a person who witnessed the event being recorded. (*People v. Goldsmith, supra,* 59 Cal.4th at p. 268.) Instead, "[i]t may be supplied by other witness testimony, circumstantial evidence, content and location. [Citations.]" (*Ibid.*)

Gang expert Lopez described the contents of the subject videos in considerable detail. Not only did he identify appellant and several other Locotes members, he also identified particular locations and specific items depicted in the videos based on his personal experience policing and investigating the Locotes gang. Those identifications were not disputed by the defense, nor did defense counsel question

11

Lopez's interpretation of the videos as far as what they reflected about appellant and his gang.

Granted, there was no testimony as to exactly when the videos were made or who posted them online, but Lopez testified they appeared to reflect events near the date of the shooting. In addition, Lopez noted the videos had the Locotes name in their titles when he found them during his investigation, and his testimony confirmed they related to the Locotes gang. Suffice it to say, there was sufficient evidence of authentication to allow the jury to consider the videos. (See *People v. Goldsmith, supra,* 59 Cal.4th at p. 267 [as long as there is a prima facie showing of authenticity, video evidence is admissible; the possibility that conflicting inferences may be drawn regarding authenticity goes to weight, not admissibility]; *In re K.B.* (2015) 238 Cal.App.4th 989, 997-998 [authentication of photos was sufficiently established by officer's testimony identifying the people, location and clothing depicted in them].)

Appellant would also have us believe the YouTube videos were unduly prejudicial under Evidence Code section 352.[4] But that section only bars evidence that uniquely tends to evoke an emotional bias against the defendant. (*People v. Bell* (2019) 7 Cal.5th 70, 105; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) And that depends not only on the nature of the subject evidence, but the nature of the case as a whole. Here, the underlying circumstances of the case implicated appellant as the gunman in an unprovoked drive-by shooting, and appellant's gang was portrayed as a rugged criminal enterprise that thrived on intimidation and violence. Viewed in the context of this evidence, the YouTube videos were not unduly prejudicial within the meaning of Evidence Code section 352. (Cf. *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [prejudicial effect of other crimes evidence was greatly diminished because it was no more

---

[4]      Under that section, evidence is inadmissible "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

12

inflammatory than the evidence related to the charged offenses]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211 [same].)

However, our analysis of the YouTube videos would not be complete absent a discussion of newly enacted Evidence Code section 352.2, which became effective earlier this year and is the subject of the parties' supplemental briefing. (Stats. 2022, ch. 973, § 2, eff. Jan. 1, 2023.) To protect freedom of speech and guard against racial stereotyping, that section requires trial courts to give special scrutiny to evidence in the form of a "creative expression" – such as song lyrics, art or film – that is offered against the defendant in a criminal prosecution.[5] Appellant argues Evidence Code section 352.2 applies retroactively to his case and would likely preclude the YouTube videos that were admitted against him. But in respondent's view, the statute is prospective only, and it would not have any bearing in this case anyhow because the videos are not creative expressions, nor is there any evidence that appellant personally created them. While respondent admits the videos were set to rap music, a popular form of creative

---

[5]    Evidence Code section 352.2 provides: "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code] [s]ection 352, shall consider, in addition to the factors listed in [Evidence Code] [s]ection 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] [s]ection 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings.

"(b) If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party:

"(1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression.

"(2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings.

"(3) Evidence to rebut such research or testimony.

"(c) For purposes of this section, 'creative expression' means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.

"(d) The question of the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to [Evidence Code] [s]ection 402. The court shall state on the record its ruling and its reasons therefor."

13

expression, he correctly points out the lyrics were not offered or admitted as substantive evidence to prove appellant's guilt.

The case law is divided as to whether Evidence Code section 352.2 applies retroactively to cases like appellant's, which are not yet final for purposes of direct appeal. (Compare *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2023, S279081 [yes it does]) with *People v. Ramos* (2023) 90 Cal.App.5th 578 [no it doesn't].) However, even if it does, reversal would not be required here because any error in admitting the YouTube videos at appellant's trial was harmless under any standard of review.

That's because the videos merely constituted a visual representation of all the things gang expert Lopez talked about at length during his testimony. Having already heard from Lopez about how gangs use hand signs, graffiti, guns and criminal activity to protect their turf, spread fear, and inflict violence on their rivals, the jury was unlikely to have been emotionally swayed by the YouTube videos. Also, being cumulative in nature, the videos were relatively unimportant to the prosecution's case in the true scheme of things. (Compare *People v. Venable, supra*, 88 Cal.App.5th at pp. 455-458 [rap video implicating the defendant in charged offenses reversible error because it was a central part of the prosecution's case].)

In assessing possible prejudice, it is also significant the YouTube videos were not used to show appellant had a propensity to commit criminal acts or to prove he was guilty of the nongang charges simply by virtue of his membership in the Locotes gang. Rather, the prosecution used them to prove appellant's gang membership and his motive and intent behind the shooting, which were highly relevant to the charged offenses and enhancements.

And while appellant fears the videos carried the potential for the type of racial stereotyping that Evidence Code section 352.2 was intended to guard against, the jury was expressly instructed not to let the issue of race influence its decision-making

14

process, (CALCRIM No. 200) and there is nothing in the record to rebut the presumption the jury understood and followed this admonition. (See generally *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 [a foundational presumption underlying our constitutional system of trial by jury is that jurors are capable of understanding and applying all of the instructions they are given].)

In light of all these considerations, it is virtually inconceivable appellant would have obtained a more favorable verdict had the YouTube videos been excluded from his trial. Their admission into evidence was, at most, harmless error.

*Hypothetical Questions*

Appellant also claims that some of the hypothetical questions the prosecutor posed to gang expert Lopez were improper because he failed to frame them in terms of a hypothetical. Appellant contends this permitted Lopez to offer his opinion about the facts of this case and usurped the jury's duty to determine the truth of the charges. However, given how the questioning transpired, we do not believe it infringed appellant's right to a fair trial, trial by jury, or due process of law.

In a criminal case, the question of guilt is reserved for the jury, and thus outside the scope of expert testimony. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) However, expert testimony offered in response to a hypothetical question is allowed even if it relates to the ultimate issue to be decided by the jury. (*Ibid.*) Thus, "[w]hile a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.)

Of course, to be probative of the actual charges, the hypothetical question must be grounded in the evidence presented before the jury. (*People v. Vang, supra,* 52 Cal.4th at p. 1045.) Appellant does not dispute that requirement was met here. Rather,

15

his complaint is that the prosecutor's hypothetical questions were *too* grounded in the evidence; they were so factually specific that they lost their hypothetical quality and became vehicles for gang expert Lopez to give his opinion about the truth of the gang charges. The record shows otherwise.

As a factual predicate for his hypothetical questions, the prosecutor asked Lopez to assume two Locotes members, along with a Bishop Street member, drove into rival territory to shoot a Lopers member and then fled the police in a fruitless attempt to avoid apprehension and get rid of the gun. The prosecutor then asked Lopez if such conduct would benefit the Locotes gang, and he said it would by enhancing the gang's reputation for violence.

The prosecutor also asked Lopez if such conduct would promote, further, and assist criminal conduct by members of that gang. Villareal's attorney objected on the basis the prosecutor failed to phrase the question as a hypothetical, and the court sustained the objection. The prosecutor then asked Lopez to answer the question "based on the facts" he received in the "hypothetical." That prompted Marin's attorney to object on the basis it was improper for the prosecutor to ask Lopez his opinion about something that was both a hypothetical and a fact.

After the objection was sustained, the prosecutor rephrased his question this way: "Referencing the hypothetical, if the hypothetical were true, then would the conduct of those three individuals from the hypothetical . . . actually promote, further and assist criminal conduct by Locotes criminal street gang members?" This time, defense counsel's objection to the form of the question was overruled, and Lopez answered in the affirmative. He also provided a detailed explanation for his opinion.

Lopez spent the rest of the afternoon answering questions on cross-examination. The next morning, on redirect, the prosecutor asked him, "Going back to the hypothetical from yesterday, do you remember all the long, long list of facts that I read to you in the hypothetical situation?" When Lopez said he did, the prosecutor asked

16

him "how would the driver, specifically in that hypothetical, be benefiting Locotes criminal street gang in his actions?"

Lopez replied, "The driver in the hypothetical would be benefitting the Locotes street gang [by] providing the tool, the driving vehicle, to execute this crime, the shooting against a rival Lopers' gang member." Marin's attorney objected to this response on the grounds it was speculative and constituted an improper opinion, but the court allowed the answer to stand. The prosecutor then asked Lopez if the driver's flight from the police benefited the Locotes gang, which led Marin's attorney to renew his objection. That led to a chambers conference outside the presence of the jury.

During the conference, Villareal's attorney complained the prosecutor failed to reference the hypothetical in his last question to Lopez. Counsel said this made it nearly impossible for the jury to "intellectually distinguish between a hypothetical and the facts of this case[.]" "It's a common mistake. I don't think he's doing it on purpose, but it's important that the jury, question by question, be referenced to the hypothetical and not the facts of this case." Although the court agreed with counsel's point, it did not see that as being a problem in this case. However, out of an abundance of caution, the court admonished the prosecutor to "make sure the jury knows we're talking only about the hypothetical."

The prosecutor agreed "all the questions should be phrased in terms of the hypothetical." But when he resumed his questioning of Lopez, he did not specifically mention the hypothetical. He simply asked Lopez if he remembered the last question he posed to him. Lopez said he did and proceeded to explain why he believed the driver's actions in fleeing the police benefited the Locotes gang. That prompted the court to chime in with its own questions:

"The Court: And, sir, your response just now has been based on the hypothetical that was given?

"[Lopez]: Correct, sir.

17

"The Court: And only the hypothetical?

"[Lopez]: Yes, sir.

"The Court: Okay. Thank you."

The prosecutor then asked Lopez if he remembered the factual predicate for the hypothetical questions he was asked the previous day, specifically "the conduct of the two passengers in the hypothetical," and Lopez said yes. "And how do[es] the hypothetical passengers' conduct benefit the Locotes criminal street gang in the hypothetical?" the prosecutor asked. Lopez said their conduct benefited the gang "by causing fear, intimidation, being in the vehicle, and also . . . being able to back each other up when they're about to commit a shooting against a rival gang. . . . They're assisting each other during the commission [of the crime described in] the hypothetical."

Following up, the prosecutor asked Lopez if "the hypothetical shooting" also benefited Locotes, and he said that it did by inflicting violence on a rival gang member and letting everybody know the Locotes were not to be trifled with.

Next, the prosecutor asked Lopez if, "in the hypothetical situation," the "three hypothetical people" in the car would be working in association with one another and promoting, furthering and assisting in felonious criminal conduct by others? Again, Lopez answered in the affirmative. He also spoke about how violence by gang members tends to intimidate people and deter them from coming forward and reporting gang crimes to the police.

Appellant contends the prosecutor's hypothetical questions were phrased in a manner that allowed Lopez to opine about the actual facts of the case and the actual defendants, as opposed to hypothetical facts and hypothetical people. This complaint highlights the mental agility required by such questions: Under our law, they are not relevant unless they accurately relate to the facts of the case, but if they accurately relate to the facts of the case, they come perilously close to an opinion on the defendant's guilt.

18

We acknowledge this conundrum. But we do not think the line was crossed here because many of the prosecutor's questions – as well as Lopez's answers – made specific reference to the information described in the hypothetical. It's true that following the chamber's conference on this issue, the prosecutor did not use that phrase in his first question to Lopez. But after Lopez gave his answer, the trial judge alertly interjected his own questions to make sure the jury understood that Lopez was referring solely to the information provided in the hypothetical.

Under these circumstances, we do not believe the jurors would have construed Lopez's testimony as an opinion about appellant's guilt. Rather, they would have properly understood that Lopez was commenting on the facts laid out in the hypothetical, and his opinions were only relevant to the extent those facts mirrored the evidence presented during the trial. The court's instructions were designed to make this point clear to the jury, and we conclude the prosecutor's hypothetical questions in this case were not improper. They did not invade the purview of the jury or infringe appellant's constitutional rights in any respect.

### Cumulative Error

Appellant contends that, taken together, the failure to bifurcate the gang charges, the admission of the YouTube videos, and the prosecutor's hypothetical questions to Lopez had a "negative synergistic effect" that rendered his trial unfair. However, as we have explained, the gang evidence was crucial to the central question in the case, i.e., appellant's intent, and neither the nature nor the presentation of that evidence undermined appellant's constitutional rights. Even viewing appellant's claims in conjunction with one another, we remain convinced he received a fair trial.

### Sentencing Issues

Appellant does have some valid sentencing claims, however. Some of those claims relate to the law as it existed at the time appellant was sentenced, and some relate to the current sentencing statutes.

For his crime of attempted premediated murder, the trial court sentenced appellant to life in prison with the possibility of parole after 55 years. The 55-year term was comprised of a 25-year-to-life enhancement for vicariously discharging a firearm (§ 12022.53, subds. (d) & (e)(1)), plus a 15-year-to-life minimum parole eligibility term for benefiting a criminal street gang (§ 186.22, subd. (b)(5)), which the trial court doubled to 30 years to life due to appellant's prior strike conviction. The court also imposed mid-term sentences on the assault and street terrorism counts, but it stayed those sentences pursuant to section 654, and it struck the remaining enhancements.

The parties agree that because appellant was found to have been vicariously armed, and not the actual shooter, he cannot be subjected to both the 25-year-to-life firearm enhancement and the 15-year-to-life minimum parole eligibility period. (*People v. Brookfield* (2009) 47 Cal.4th 583; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420.) There is also no dispute that with respect to the assault and street terrorism counts, appellant is entitled to the benefit of new legislation that requires trial courts to consider whether the defendant's youth was a contributing factor in his crimes,[6] and that gives trial courts the discretion to impose sentence for any offense for which the defendant was convicted, not just the greatest offense, when section 654 applies. (See Assem. Bill No. 124 (Stats. 2021, ch. 695); Assem. Bill No. 518 (Stats. 2021, ch. 441).) Therefore, appellant's sentence must be reversed, and the case must be remanded for full resentencing.

The parties also agree on two issues that are relevant to appellant's resentencing. First, due to the passage of Assembly Bill No. 1869 following appellant's original sentencing hearing (see Stats. 2020, ch. 92, § 11), he is no longer responsible for any outstanding costs associated with the preparation of his probation report. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 625-626.) Second, appellant's court operations and

---

[6] Appellant was 23 years old when the shooting in this case occurred.

criminal conviction assessments must be reduced from $200 and $150, to $160 and $120, respectively. (See § 1465.8; Gov. Code, § 70373.)

That brings us to appellant's final sentencing claim. He argues he has the right to a youthful offender parole hearing and a so-called *Franklin* proceeding to gather evidence relevant to that hearing. (See § 3051; *People v. Franklin* (2016) 63 Cal.4th 261.) For the reasons we recently explained in *People v. Delgado* (2022) 78 Cal.App.5th 95 (*Delgado*), we reject appellant's claim that he is entitled to a youthful offender parole hearing as a matter of equal protection. (*Id*. at pp. 99-103 [excluding Three Strike defendants from youthful parole hearing consideration does not constitute unequal treatment under the law]; accord, *People v. Moore* (2021) 68 Cal.App.5th 856, 863-864; *People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1164-1167.)

However, our *Delgado* decision also makes clear that, as a youthful offender, appellant does have the right to a *Franklin* proceeding to facilitate any standard parole hearing to which he is entitled. (*Delgado, supra,* 78 Cal.App.5th at pp. 103-104.) Therefore, as respondent concedes, the trial court must allow appellant the opportunity to present evidence of youth-related factors for use in any future parole hearing. (*Id*. at p. 104.)

## DISPOSITION

Appellant's conviction for street terrorism in count 3 is reversed, as are the jury's true findings on the gang enhancement allegations. On remand, the prosecution shall have the option to retry appellant on those charges. Irrespective of whether the

21

prosecution exercises that option, appellant's sentence is reversed, and the trial court shall resentence him in accordance with our opinion and all current sentencing rules. In all other respects, the judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

GOETHALS, J.

22